### In re BRISTOL MOUNTAIN ENTERPRISES, INC., Debtor.

### CENTRAL TRUST COMPANY, Plaintiff,

### v.

### BRISTOL MOUNTAIN ENTERPRISES, INC., Defendant.

### Bankruptcy Nos. 81–20905, 81–2131A.

United States Bankruptcy Court, W. D. New York.

Aug. 26, 1981.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

This action was commenced by Central Trust Company to lift the stay under 11 U.S.C. § 362(d) or in the alternative to get adequate protection under 11 U.S.C. § 361.

After the preliminary hearing and based upon the testimony which was submitted at that time, this Court found that Central Trust Company, hereinafter referred to as "Central", had a valid first mortgage upon Bristol Mountain Enterprises, Inc.'s, hereinafter referred to as "Bristol", real property upon which there was a balance due of $896,162.77 on June 22, 1981; that Central had a valid second mortgage on Bristol's real property upon which there was a balance due of $1,044,661.60 on June 22, 1981; that Central had a valid lien on Bristol's equipment but no evidence of equipment value was submitted to the Court at the preliminary hearing; that the total amount due on both mortgages on June 22, 1981 was $1,940,824.37 and the per diem interest on June 22, 1981 on the first mortgage was $507.68 per day and on the second mortgage $351.67 per day; that for the purposes of the preliminary hearing only the market value of the property was determined to be $1,780,000.00 and, finally, that plaintiff was 91.72% secured at that time. As a result of those findings, this Court ordered Bristol to pay $787.58 per day commencing June 23, 1981 as adequate protection to Central. A final hearing was scheduled at which adequate protection was to be set for the secured claims of Central against the Chapter 11 debtor, Bristol.

At the final hearing, which was delayed two weeks beyond the normal 30 days by stipulation of the parties so that additional appraisals could be made, each party submitted appraisals to the Court. The defendant through its appraiser, The Peatfield Company, Ltd, represented at the hearing by David F. Peatfield, MAI, gave a going concern value for Bristol of $1,482,600.00. The plaintiff through their appraisers, Midland Appraisal Association, Inc., represented at the hearing by David C.

Paul S. Groschadl, Rochester, N. Y., for plaintiff.

Louis A. Ryen, Rochester, N. Y., for defendant.

Schwaner, MAI, gave a fair market value of Bristol inclusive of lands, buildings, ski lifts, snow making equipment and other miscellaneous personal property as of June 30, 1981 of $2,070,000.00.

Mr. Peatfield described going concern value as:

1. The value existing in a proven property operation, considered as an entity with business established, as distinct from the value of real estate only, ready to operate but without a going business.
2. Includes consideration of the efficiency of plant, the know-how of management, and the sufficiency of capital.
3. It is an excess of value that may exist over cost which arises as a consequence of a complete and well-assembled operation production mechanism; it is the value of an efficient layout and operational control system resulting in the most desirable synchronization of the merchandising, production, or distribution activities of the enterprise, and includes goodwill...

Mr. Peatfield first used a bifurcated approach to establish real estate value. He took the value of certain properties which had been sold in the vicinity and then after consideration being given for the time of sale, location, size and enhancements without considering the buildings, he arrived at a value for the land of the debtor of $700 per acre. Since the debtor owns 302 acres, he arrived at a total value for the real estate without buildings of $210,000.00. However, he never fully explains why $700 is the exact per acre value of the debtor's land. Next, he proceeded to take an economic approach to the valuation of the real property. To arrive at the value of the real property by the economic approach, he took the gross potential income, subtracted the expenses and came up with an income before profit or consideration for personal property.

To arrive at gross potential income and expenses, he took into consideration not only the actual income expenses but an amalgam of income and expenses from nearby ski areas and from statistics provided by the National Ski Area Association.

From the income before profit or consideration for personal property, he subtracted a 10% profit of $55,000 and a $180,000 which represented replacement value and profit thereon for fixtures attached to realty. This left him with a net income of $82,000 to which he applied a capitalization rate of 14.2% which was arrived at by assuming a 50% mortgage at a rate of 19.44% and a return on 50% equity predicated at 9%. The combination of the two factors resulted in the capitalization of 14.2%. He then came up with a value of the real property which was $577,500 from which he subtracted $100,000 for the encroachment (that is described hereafter) plus a $100,000 to cure the encroachment. This left him a Going Concern Value of Real Property of $377,500.

To this going concern value of real property, he added the sum of $821,350 which represents the appraisal of the equipment and furnishings which was made by Hugh Knapp Associates.

He then proceeded to analyze current assets and current liabilities. He found that there were current assets of $632,222 and from this he subtracted the current accounts payable of $276,261. All other liabilities he determined amounted to $72,218. These were subtracted from the current assets and he arrived at a figure for current assets of $283,800.

Completely ignoring the market value approach to real property, he took the going concern value of real property of $377,500, added the value of the equipment, $821,350 and the value of the current assets, $283,800, to come up with a going concern value of Bristol of $1,482,650.

The problem with Mr. Peatfield's analysis, appraisal and testimony is that he failed to fully explain how he arrived at the figures used. As an example, one of the deductions from "Income Before Profit or Consideration for Personal Property" is a deduction of $180,000 for "Income necessary to satisfy personal property requirement". To arrive at this figure, he at page eight of his report wrote:

We have chosen a premise which utilizes two separate interest rates (1) a speculative rate representing a fair rate of return on capital commensurate with the risks involved, and (2) a safe rate for a "sinking fund" designed to return all capital in a lump sum at the termination of the investment. The return on capital is always the same. The sinking fund contributions to the sinking fund are sometimes thought of as a return of capital, but technically they are payments which provide for the future return of capital which does not occur until the end of the investment (remaining useful life). The system (or premise) is designed for investments in wasting assets such as the lifts and equipment at Bristol Mountain. In our analysis, we have chosen an interest on of 12% and a 7% safe rate for the sinking fund analysis.

The amount of yearly income necessary for the economic consideration of lifts, snow making equipment, vehicles, leased equipment and furniture and fixtures is $180,000.

It should be noted that as this figure goes down the value of the real property is enhanced. For every $10,000 this figure goes down, the value of the real property goes up $70,422. Therefore, it seems reasonable that great care should be taken to fully explain how the figure is arrived at.

Another example, when Mr. Peatfield valued the encroachment on Bristol created when Bristol, by its president, Fred W. Sarkis, transferred to Fred W. Sarkis, individually, some 50 acres of land which includes a small portion of one of the easiest slopes and trails of the debtor, namely, Lower Infinity, he took a cost to cure the encroachment, added it to the value of encroachment and subtracted both from the going concern value of the realty. It seems unreasonable to discount $200,000 from the going concern value for a piece of property which Peatfield valued at $10,000.

■ As a result of the foregoing and since Mr. Peatfield has failed to justify the figures he uses or to convince the Court of their completeness and accuracy, his appraisal has been given no weight.

The plaintiff's appraisal was made by David C. Schwaner, MAI, of Midland Appraisals Association, Inc. This appraiser sought to establish what the fair market value of the property was. He defined fair market value as "the highest price in terms of money which a property will bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgably and assuming the price is not affected by undue stimulus."

He employed only the income or economic approach to value. The market approach was omitted because the appraiser felt that there were no significant transfers to which a comparison could be made. The cost approach was omitted because that valuation technique is generally employed for new construction, special purpose property or when there is insufficient data to estimate the value by either the market or income approach. The appraiser felt that while a ski area is classified as a special purpose property there was insufficient market data to make realistic estimates of curable and incurable functional obsolescence.

The appraiser opted for the economic or income approach to valuation utilizing debtor's five to ten year history of income and expense data which he obtained from operating statements of the debtor. He felt this was the most valid method of estimating the value of an operating ski resort. In arriving at an economic valuation, he considered six critical elements, namely, physical site characteristics, ski area economic characteristics, the skier market, competition, cost of capital and operating policies.

To arrive at his estimate of value from the income or economic approach, Schwaner used two sets of figures. One was "stabilized" net income which was well supported by historic performance and was relatively easy to reach in any season. He gave this figure a capitalization rate based upon a smaller return because the risk was small. To this he added a value arrived at based upon "potential projected" income which he

felt feasible on historic performance, when all conditions which he considered, were extremely favorable. This "potential projected" income because the chance of it occurring was small was heavily discounted by using a high capitalization rate based upon the high risk involved. Using these two values, Mr. Schwaner came up with a value of $2,070,000.

It should be noted that Mr. Schwaner in his appraisal paid no attention to the encroachment on Lower Infinity which was described previously because he was instructed not to consider this item by his employer. The attorneys for the plaintiff have argued that the alleged encroachment on Lower Infinity has no bearing on the value of the property of Bristol since the facts establish permanent easement by implication in favor of Bristol and against Sarkis. Plaintiff has buttressed his argument with a brief and defendant has declined to provide a brief.

The legal argument of the plaintiff in this regard is based upon the criteria set forth in *United States v. O'Connell*, 496 F.2d 1329, where the Court said at pages 1332 and 1333:

> The district court relied upon the four elements of implied easements which were first stated by Justice Bergan in *Jacobson v. Luzon Lumber Co.*, 192 Misc. 183, 79 N.Y.S.2d 147 (Sullivan County Sup.Ct. 1948), aff'd per curiam, 276 App. Div. 787, 92 N.Y.S.2d 537 (3d Dept.1949), aff'd mem., 300 N.Y. 697, 91 N.E.2d 724 (1950), and since repeated in other cases, e. g., *McQuinn v. Tantalo*, 41 A.D.2d 575, 339 N.Y.S.2d 541 (3d Dept.1973). These elements are: (1) The relevant parcels of land must have once been in unitary ownership; (2) A use must have been established in which one part or parcel of the land was subordinated to another; (3) The use must be plainly and physically apparent by reasonable inspection; and (4) The use must affect the value of the estate benefitted and *it must be necessary to the reasonable use of such estate.**

New York Jurisprudence, Volume 17 at Page 344 in discussing implied reservations says:

> Thus, in this state the rule of strict necessity is usually applied to implied reservations. The necessity is determined as of the time of the conveyance. So, where an owner who has used a roadway or pathway over one part of his land for the benefit of another part conveys the part over which the way passes, he is generally held not to reserve by implication a right to use the way for the benefit of his remaining land, unless it is strictly necessary or amounts to a way of necessity.

In *Wells v. Garbutt*, 132 N.Y. 430, 30 N.E. 978, an old but leading case in New York State, the Court discussing implied easements says at Pages 437 and 438, 30 N.E. 978:

> But even if the findings, when liberally construed, show that the alleged easement was apparent and continuous, they utterly fail to bring it within the rule of strict necessity. It does not appear that the water-power of defendant would be materially diminished if he were not permitted to overflow the lands in question... The doctrine of implied reservation rests upon the presumed intention of the parties as it is gathered from the conveyance, interpreted in the light of the circumstances surrounding them when it was executed and with reference to which, as existing facts, they are supposed to have contracted. If it appeared that the mill could not be operated without overflowing the plaintiff's land, it would be cogent if not conclusive proof of that strict necessity, which does not create the easement, but is simply evidence as to the intention of the parties. If, on the other hand, it appeared that owing to the slight declivity the accumulation of water was insignificant and that the mill property was worth substantially as much without the right in controversy as with it, there would be no proof of "necessity" and nothing upon which an implication in favor of the mortgagor or grantor could

* Emphasis Added

rest.... When it is claimed that an easement exists by necessity, evidence of the necessity must be given.

In this case, while it would be nice to have the implied easement, the necessity therefore has not been shown. When this was called to the attention of the parties in this case, they obliged the Court by stipulating that the value of the encroachment was $50,000.

■ Therefore, the value of Bristol's property is set at $2,020,000. This includes both real and personal property. The first and second mortgages on the real property total $1,940,824.37 on which there is a per diem interest rate of $859.35. In addition, a lien has been proved on the personal property of the debtor but since that is included in the $2,020,000 value only Central's lien to the extent of $79,175.63 attaches to the personal property of the debtor. The debtor must pay as adequate protection the $859.35 per day plus the per diem interest rate on the $79,175.63 of personalty from the date of the filing of the complaint to lift the stay, less the amount that has been paid as a result of this Court's decision in the preliminary hearing. Payment of these sums must be made on a weekly basis and the arrearages must be brought up to date by 30 days from the date of this decision. Delinquency in any payment for a period of 7 days shall result in the lifting of the 11 U.S.C. § 362(a) stay, and it is so ordered.