**In re POLRIES BROTHERS, Debtor.**

**Bankruptcy No. 83–05172.**

United States Bankruptcy Court,
D. North Dakota.

Feb. 4, 1985.

Ross Espeseth, Bismarck, N.D., for debtor.

James Pfau, Minneapolis, Minn., for Norwest Bank-Mpls.

## ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court on Motion for Relief from Stay filed by Norwest Bank Minneapolis, National Association (NORWEST), on January 14, 1985. The basis for the Motion is two-fold: Relying upon section 362(d)(1) and (2), Norwest seeks relief as against the farm real property consisting of approximately 7,748 acres upon which it holds a third mortgage. It claims that the Debtor has no equity in the property, that its interest has not been adequately protected and that the Debtor is unable to consummate an effective plan. Relief is additionally sought against personal property consisting of all farm equipment in which Norwest is secured by virtue of a blanket security interest. In this regard, its Motion is based upon the Debtor's breach of a stipulation and order for adequate protection. The Debtor filed an objection to the Motion, and the matter came on for hearing before the undersigned on January 29, 1985. From the record in the case, the testimony adduced at the hearing and the exhibits received, the facts as relevant are as follows:

## FINDINGS OF FACT

### 1.

The Debtor is a farming partnership formed by brothers, Donald and Alvin Polries, in 1948. The partnership owns approximately 7,748 acres of land (situated in Wells and Stutsman County, North Dakota). Of this land, approximately 6,900 acres is in crop and 800 acres is non-crop. In addition, the partnership has rented other acreage bringing its total farm acreage to 11,000 acres. The land has been used for dry farming and for an extensive cattle feeding operation with a capacity at one time for upwards of 10,000 head.

On March 24, 1983, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. Both a Plan and Disclosure Statement have been filed with the Disclosure Statement being approved on April 10, 1984. The Plan was modified on one occasion but has never been confirmed.

### 2.

Norwest holds a third mortgage on all real property and a blanket chattel mortgage. Federal Land Bank has a first mortgage lien on 6,600 acres securing an outstanding indebtedness as of March 24, 1983, as of $2,238,274.00 representing principal of $1,916,666.00 and interest accrued to March 23, 1983, of $321,608.00. Since the date of filing, interest has continued to accrue at a per diem rate of $716.00. (Interest accrued since the date of filing to January 29, 1985, is $484,732.00.) The total present indebtedness owing by the Debtors to Federal Land Bank is $2,723,000.00.

Farmers Home Administration holds a second mortgage on all real property securing an outstanding indebtedness as of March 23, 1983, of $1,163,855.00 representing principal of $1,127,215.00 and interest accrued to March 23, 1983, of $36,640.00. Interest has continued to accrue since the filing date at a per diem rate of $249.00. (Interest accrual since the date of filing to January 29, 1985, is $168,573.00.) The total present indebtedness owing to FHA is $1,332,428.00.

The movant, Norwest, holds a third mortgage on all farm real property securing an outstanding indebtedness as of March 23, 1983, of $7,655,511.00 in principal and accrued interest. Interest has continued to accrue at a per diem rate of $2,385.00. (Interest accrual since the date of filing to January 29, 1985, is $1,614,645.00.) The total present indebtedness owing to Norwest is $9,270,156.00. The total indebtedness owing to these three mortgage holders as of March 23, 1983, was $11,057,640.00. Today, that indebtedness is $13,325,584.00. Interest is accruing at a combined per diem rate of $3,350.00 or $1,222,750.00 per year.

### 3.

On May 23, 1984, Norwest brought a Motion for adequate protection and a partial relief from stay. On the eve of the date set for hearing, the Debtor and Norwest entered into a stipulation for adequate protection and turnover of cash collateral. The terms of this stipulation were read into the record at a hearing held on August 28, 1984. The Debtor's attorney was asked at the hearing whether he discussed its terms with his clients to which he replied that he had. He was also asked if his clients understood the importance of the agreement and what the result would be in the event that the required payments were not forthcoming. To this he replied that they understood. The stipulation was reduced to writing, signed by both Donald and Alvin Polries on December 11, 1984, and filed with the Court on December 17, 1984. The Court, on the basis of the Stipulation, entered its Order for adequate protection on January 2, 1985. The Stipulation and Order by its terms required the Debtor, by December 15, 1984, to pay Norwest $75,000.00; pay Federal Land Bank and Farmers Home Administration all interest accrued on their respective debts since the date of filing to December 15, 1984; pay to contract for deed vendors all payments accrued since the date of the Chapter 11 filing to December 15, 1984; and pay all real estate taxes owing Stutsman and Wells Counties which accrued since the date of filing. The agreement also required delivery of $97,989.00 in cash collateral to Norwest by January 12, 1985.

Paragraph 3 of the Stipulation and Order provides that if the Debtor fails to make any payment required, "the automatic stay under Section 362 of the Bankruptcy Code ... shall terminate automatically and without need for further motion or order to permit Norwest to take such action as may be necessary or appropriate, including but not limited to replevin and foreclosure, to enforce its security interest in any and all of the Equipment." Don Polries testified at the hearing on the instant Motion and acknowledged that he agreed to the Stipulation because at the time the crops looked good. Unfortunately, the yields were far less than anticipated and certain expected payments from other sources had not been forthcoming. As a result, the Debtor has not made any payments under the Stipulation and Order for adequate protection except for certain tax payments and payments on the contracts for deed. Mr. Polries stated that he is yet willing to live up to the terms of the Stipulation to the best of his ability. Under the terms, Federal Land Bank was to receive a payment of $259,000.00; Farmers Home Administration a payment of $95,000.00; Norwest a payment of $75,000.00 plus delivery of $97,989.00 cash collateral. The total cash required for compliance is $526,989.00. According to Mr. Polries, he has $140,000.00 on hand, expects $100,000.00 from the sale of sunflowers and $40,000.00 from Commodity Credit Corporation. The Debtor has breached the terms of the adequate protection agreement and does not have the ability to meet the obligation either now or in the future.

### 4.

Substantial disagreement exists with respect to the value of the real property against which relief is sought and whether that property has suffered a decline in value since the filing of the petition. Norwest and the Debtor presented testimony from two qualified and widely-recognized appraisers, both of whom have previously

testified before this Court and are respected in their field. The Debtor engaged the services of Donald Doll who conducted an appraisal over the late summer and early fall of 1984, rendering his written report as of October 17, 1984 (Exhibit 3). Eugene D. Weekes, retained by Norwest, did his appraisal in January 1984 and issued his written report effective as of January 18, 1984 (Exhibit 1). While both appraisers differ as to the value of the property, their major disagreement is the degree of decline in value since March 24, 1983. There was also a minor discrepancy in the amount of acreage appraised. Weekes appraised 7,758.67 acres, and Doll used a total acreage figure of 7,739.37 for his appraisal. (The Court has used an average of these two as a reasonable proximation of the total acreage in question.) Weekes relied upon 11 comparables with primary emphasis being placed on five 1983 sales, four of which were contract for deed sales. Doll's appraisal was much more comprehensive in that he studied 100 sales occurring over 1980 and 1984 and used 30 of these as reliable comparables. In rendering his opinion, he considered sales in Stutsman and Wells Counties, where the Debtor's land was located, as well as sales in the adjacent counties of Foster and Eddy. The land in question has vast improvements built upon it which can only be said to be impressive. The photos attached to Doll's report depict a very extensive and handsome farm layout, including a large cattle-handling facility, several residences, a grain elevator complex, machine shop, sheds and various storage facilities. Weekes attributed a contributory value of $715,000.00 to these improvements while Doll allowed a contributory value of only $250,000.00. Both appraisers in their reports felt that the improvements were over-improvements because of the lack of interest on the part of potential buyers in livestock feeding operations. Doll spent considerable time exploring this problem, noting in his report that his research revealed no set of farm buildings in North Dakota which had a contributory value of over $125,000.00. He consulted several lending institutions and found a lack of interest on their part in financing a cattle feeding operation. He felt that the grain-handling facility as well as the cattle feeding facilities were over-improvements and to a large extent obsolete. Mr. Doll's opinion as to contributory value is backed by more empirical research and is accepted by the Court as being more reliable.

Weekes placed a total fair market value on the real property as of January 18, 1984, of $5,686,000.00 with an overall per acre value of $732.00. (Land only was assessed a value of $640.64 per acre.) Doll placed a total fair market value on the real property as of October 17, 1984, of $4,120,000.00 with an overall per acre value of $532.00. (Land only was assessed a value of $500.000 per acre.) The difference between the appraisers' overall per acre value is $201.00. The difficulty is reconciling these appraisals to reflect what the fair market value was on March 24, 1983, and more importantly, in view of probable declines in market value, arriving at the property's present market value. Weekes did not render an opinion as to the land's fair market value in March 1983 but did state that since his appraisal in January 1984, he felt, based on a recent inspection of land sales, the value of the Debtor's property had declined by nearly $1,000,000.00. If Weekes is correct, it means that the land in question is presently worth $4,686,000.00 with a decline of $128.00 per acre since January 1984. Doll, on the other hand, testified in court that while he could not render an opinion as to values in March 1983, he felt that his estimate of value given for October 1984 would have been only a little higher if given in January 1984. He also said that the value in the spring of 1983 would not have been significantly higher. From his testimony, one might conclude that in Mr. Doll's opinion land values have not declined much over the 20 months from March 1983 to January 1985. Interestingly, in his written report, Mr. Doll painted quite a different picture. In his appraisal report, he stated that his studies indicate a definite softening of land

prices and that there had been a lowering of land values in Stutsman and Wells Counties during 1984. Of the 30 comparables relied upon, Mr. Doll placed particular emphasis on sale no. 90 and 91. Sale 91 was significant to him as being representative of land values during the early part of 1984. The price per acre for comparable 91 was $500.00. Mr. Doll considered sale no. 90 to be significant because it was the most recent and "indicates the downward trend in land values as suggested by the land value studies ..." The price per acre for comparable no. 90, a September 1984 sale, was $375.00. If these two sales are indeed significant as Mr. Doll says they are, then land can be said to have lost approximately $125.00 per acre between January 1984 and January 1985. This one-year decline suggested by Doll's appraisal report is fairly close to Weekes' suggested per acre decline of $128.00.

From the testimony and exhibits, the Court cannot determine precisely what the value of the land was in March of 1983 but concludes that Weekes' appraisal conducted in January 1984 is a more reliable proximation of what the value was in January of 1984. In January 1984, the Debtor's real property was worth $5,686,000.00 as suggested by Weekes. From the reports and testimony of both appraisers, it appears to the Court that the land in fact has experienced a continuing erosion of value over the last year of approximately $125.00 per acre for a total decline over the past year of approximately $968,500.00 (7,748 acres × $125.00). From this, the Court concludes that the Debtor's land comprised of 7,748 acres, more or less, is presently worth $4,717,500.00.

## CONCLUSIONS OF LAW

### 1.

■ Before addressing Norwest's section 362 cause of action, the failure of the Debtor to comply with the terms of the Stipulation and Order for adequate protection will be disposed of. Both the Debtor and Norwest entered into the Stipulation with advice of counsel. The Debtor had

available to it the not inconsiderable bankruptcy expertise of the Rosenberg Law Firm as well as its own collective experience regarding its farm operation and its potential for meeting the required payments. The agreement is quite clear and precise in its terms. Debtor's counsel, at the August 28, 1984, hearing, was satisfied with the terms and satisfied that the Polries understood them. It is the most gross misfortune that the economy and nature did not cooperate so that payments could be made. But this misfortune does not alter the fact that the parties entered into a post-petition Stipulation for adequate protection. Such stipulations must be enforced without regard to subsequent misfortune because misfortune and other excuses are always possibilities and if used as a basis to ignore or avoid adequate protection stipulations, soon no creditor would be willing to enter into such an agreement to the eventual detriment to all Chapter 11 debtors. Post-petition agreements for adequate protection must be impressed with the highest degree of reliability. The Court is not about to reconstruct, or declare invalid for any reason, a stipulation for adequate protection particularly where the debtor had the advice of capable bankruptcy counsel. The agreement has been breached and on that basis alone, cause exists for relief from stay as against all equipment in which Norwest holds a perfected security interest.

### 2.

■ Norwest seeks relief under section 362(d) of the Bankruptcy Code. This section provides:

On request of a party in interest and after notice and a hearing, the court *shall* grant relief from the stay provided under subsection (a) of this section such as by terminating, annulling, modifying, or conditioning such stay...

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if...

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d) (emphasis added). Pursuant to the foregoing section, the Court must afford a creditor relief from stay if either of two alternatives are met: (1) for cause, including a lack of adequate protection, or (2) if the debtor has no equity in the subject property and the property is not necessary to an effective reorganization. A party seeking relief under section 362(d) need establish only one of the two alternative grounds for relief having only the burden of proof as to the issue of the debtor's equity. *In re Rouse*, 43 B.R. 380 (Bankr.E.D.Pa.1984).

■ From the facts, it is apparent that the Debtor does not have any equity in the real property. The total indebtedness against the real property has arisen from $11,000,000.00 as of the date of the petition to $13,300,000.00 today while the value of the property has declined at least by nearly $1,000,000.00. Obviously the property is necessary for reorganization since it comprises the Debtor's entire asset base. A necessity for reorganization, however, is not enough; such reorganization must be capable of effective implementation. Without exploring this possibility in detail, it does appear to the Court in view of the rapidly escalating debt that an effective reorganization is probably not on the horizon in this case. Because resolution of this Motion does not turn on section 362(d)(2), further discussion of this aspect will not be had nor is the Court making a final determination on this point.

More fatal to the Debtor's hope of reorganization is section 362(d)(1). This section mandates relief from stay for cause, including the lack of adequate protection. The term "adequate protection" found in the foregoing section is not expressly defined in the Code, but reference to section 361 reveals a suggestion or illustration of what constitutes adequate protection. Courts for the most part have construed the term to mean affording protection to a secured creditor for any decrease in the value of that creditor's interest in the collateral as it existed at the time of filing. *See In re Alyucan Interstate Corp.*, 12 B.R. 803, 807 (Bankr.D.Utah 1981). The decisions indicate that "the interest in property entitled to protection is not measured by the amount of the debt but by the value of the lien." *Alyucan*, 12 B.R. at 808. *See also In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 825 (Bankr.S.D.N.Y.1982), where the court said that "[A] secured creditor has the right to receive adequate protection for any decline in value the collateral may suffer after the automatic stay is in effect, ..." *See also In re Pond*, 43 B.R. 522 (Bankr.N.D.1984). One court considering section 361 has said that Congress, by emphasizing the necessity of protecting a creditor from a "decrease in the value of such entities' interest in such property" indicated an intent that the decline in such value should be almost decisive in determining requests for relief from stay under section 362(d)(1). *In re Saypol*, 31 B.R. 796 (Bankr.S.D.N.Y.1983).

In the present case, Norwest's interest entitled to protection is subject to diminution from a decline in the value of the land itself as well as from continuing encoachment by the escalating indebtedness of the two senior lienholders. When one considers this dual erosion, it is unnecessary to this decision to arrive at precisely what the land value was on March 24, 1983. Regardless of what the actual original value entitled to protection may have been, it is clear that Norwest's interest has continued to erode. We know from the appraisals that the property was probably worth at least $5,680,000.00, perhaps more. Assuming that the real property did have a value of $5,680,000.00 on March 24, 1983, it was encumbered by two senior mortgages totalling $3,402,129.00 at that time leaving $2,277,871.00 of value available to secure Norwest's third position. It is this value that is entitled to protection. As time passed, the interest on the two senior mortgages continued to accrue at a rate of $965.00 per day so that in one year Norwest's position had been eaten away by

$352,225.00 of post-petition interest accrued to the senior lienholders. Erosion caused by a first priority lien is indicative of a lack of adequate protection. *In re Houston,* 32 B.R. 584 (Bankr.S.D.N.Y. 1983). As claims of first and second lienholders accumulate interest, the security of the third mortgage holder is diminished in equal proportion to the interest accumulations. *In re American Properties, Inc.,* 8 B.R. 68 (Bankr.D.Kan.1980). Over the 20 months that have passed between the date of filing and the present, $653,305.00 of interest has accrued on the senior debt of Federal Land Bank and Farmers Home Administration so that today, even without considering declining land values, Norwest's interest in the property has decreased to $1,624,566.00 merely by virtue of the erosion caused by the senior lienholders. Where such declines have occurred, courts in fashioning adequate protection require the debtor to pay the third mortgage holder the decrease in value of its security interest as reflected by the interest accruing on the senior mortgages. *In re Sun Valley Ranches, Inc.,* 38 B.R. 595, 598 (Bankr.D.Idaho 1984); *In re Bristol Mountain Enterprises, Inc.,* 13 B.R. 412 (Bankr.W.D.N.Y.1981); *In re American Properties, Inc.,* supra.; *In re Sombrero Reef Club, Inc.,* 7 B.R. 480 (Bankr.S. D.Fla.1980).

Plugging in the $968,500.00 decline in value that the real property has suffered over the past year finds Norwest's position even more dramatically eroded. The decline is not borne by the two senior mortgage holders since sufficient equity remains to absorb their increasing indebtedness. It is Norwest alone who, being in last position, stands to absorb all declines in real property values. The real property is presently worth $4,717,000.00 against which the senior lienholders have a total present claim of $4,055,428.00 leaving Norwest with a remaining interest of only $662,072.00. Even if the land itself does not suffer any further declines in market value, the interest continues to accrue on the senior debt at a rate of $352,225.00 per year so that with the passage of another year, Norwest would have a remaining interest of only $309,847.00. Norwest, at the present, has lost at least $1,615,799.00 of its collateral value since March 24, 1983. It is this value which, under section 361, is entitled to adequate protection and without which relief from stay is mandated by section 362(d)(1). The Court must conclude that substantial cause exists under section 362(d)(1) for the relief requested. Accordingly, and for the reasons stated,

IT IS ORDERED that the Motion filed by Norwest Bank Minneapolis, National Association, requesting relief from the automatic stay imposed by section 362 is granted as to all equipment in which the Bank is secured as well as to all real property against which it holds a mortgage.