**In re Silver ZIEBARTH and Carol Ziebarth, aka Sylvester Ziebarth, dba Z–Bar Farms, dba Z–Bar Genetics, Debtors.**

**Bankruptcy No. 89–05988.**

United States Bankruptcy Court,
D. North Dakota.

March 29, 1990.

James Coles, Bismarck, N.D., for debtors.

Jon R. Brakke, Fargo, N.D., for Farm Credit Bank.

Phillip D. Armstrong, Minot, N.D., Trustee.

MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a Motion for Relief from Stay filed January 18, 1990,

by Farm Credit Bank of St. Paul, a successor in interest to the Federal Land Bank of St. Paul. Farm Credit Bank seeks relief from stay against the Debtors' farm real property consisting of approximately 1,920 acres upon which it holds a first mortgage. Farm Credit Bank bases this motion upon section 362(d) of the Bankruptcy Code and asserts that the Debtors, Silver and Carol Ziebarth, lack equity in the subject property and that the Debtors are incapable of reorganizing their financial affairs sufficiently to obtain confirmation of their Chapter 12 plan of reorganization. The Debtors have filed an objection to the Motion for Relief from Stay, contending that the farm property is necessary for an effective reorganization and that they have the ability to confirm a Chapter 12 plan of reorganization. The matter came on for final hearing on March 14, 1990, and from the record in the case, the testimony and exhibits received at the hearing, the facts as relevant are as follows:

### 1.

The Debtors, Silver and Carol Ziebarth (Ziebarth) have a farm and cattle operation near Scranton, North Dakota. The farm is situated upon approximately 1,920 acres of land. Of this land, approximately 1,468 acres are tillable crop land with the balance of 452 acres being comprised of pasture land, farm site, and an area of wasteland. The Debtors also currently lease approximately 620 acres of land. The land has been generally used for the production of small grains and the raising of livestock. The Ziebarths initially filed for relief under Chapter 11 of the Bankruptcy Code on January 13, 1988. Their Chapter 11 bankruptcy was subsequently dismissed by this court on April 5, 1989. The Debtors have filed an appeal of this court's Order dismissing their Chapter 11 case with the District Court of North Dakota. On December 22, 1989, the Debtors filed for relief under Chapter 12 of the Bankruptcy Code.

### 2.

The present relief from stay motion concerns two loans made to the Debtors by the Federal Land Bank of St. Paul [hereinafter Farm Credit Bank of St. Paul (FCB)]. The first loan (loan "A") was in the amount of $165,000.00 and was memorialized by a promissory note dated December 6, 1979. In order to secure the loan, the Ziebarths granted Farm Credit Bank a mortgage dated December 6, 1979, on 960 acres of property described as:

> Township 130 North, Range 100 West, all of Section 4, Northwest Quarter (NW1/4) of Section 9, County of Bowman, State of North Dakota.
>
> Township 131 North, Range 100 West, Southeast Quarter (SE1/4) of Section 33, County of Bowman, State of North Dakota.

On June 29, 1987, a supplemental mortgage was added to further secure the December 6, 1979, loan. (Exhibit 3). The additional supplemental mortgage dated June 29, 1987, encumbers property described as:

> Township 130 North, Range 100 West, Southwest Quarter (SW1/4) of Section 28, County of Bowman, State of North Dakota.

The second loan (loan "B"), was in the amount of $78,000.00 plus a previous unpaid balance of $12,000.00 for a $90,000.00 total, and was memorialized by a promissory note dated December 7, 1979. In order to secure the second loan, the Ziebarths granted FCB a mortgage dated December 7, 1979, on 800 acres of property described as:

> Township 131 North, Range 100 West, North One-half (N1/2) of Section 33, the Southwest Quarter (SW1/4) of Section 33, the South Half (S1/2) of Section 35, County of Bowman, State of North Dakota.

The amount outstanding, as of December 23, 1989, on loan "A" is $305,311.10 with a per diem interest charge of $110.21. The amount outstanding on loan "B" is $177,-776.00 [1] with a per diem interest charge of

---

1. This balance was given through Farm Credit Bank's witness Chuck Erickson. However, after reviewing Farm Credit Bank's proof of claim and the judgments of foreclosure, this court has reason to believe that the debt owing Farm Credit Bank on loan "B" (dated December 7,

$43.38. The Ziebarths have been in default on the two notes for approximately the last four years. On March 14, 1990, by the Debtor's motion, this court held a valuation hearing regarding the 1,920 acres of subject real property. The 1120 acres of land securing loan "A" (Tract A) has been judicially valued at $238,359.71. The 800 acres of land securing loan "B" (Tract B) has been judicially valued at $170,280.29.

FCB is not the only lien holder on the Debtors' subject property. Farmers Home Administration holds a second priority lien of approximately $24,819.26. In addition, Dakota Western Bank of Dickinson, North Dakota holds a third and possibly a fourth priority lien of approximately $121,450.00.

On July 12, 1989, FCB received judgments of foreclosure on the subject property in District Court, County of Bowman, State of North Dakota.[2] Before a foreclosure sale could be commenced by FCB, the Ziebarths filed for relief under Chapter 12 of the Bankruptcy Code thus staying any action on the judgments of foreclosure.

### 3.

FCB seeks relief from stay pursuant to 11 U.S.C. § 362(d)(2) of the Bankruptcy Code. Section 362(d) provides:

> (d) On request of a party in interest and after notice and a hearing, the court *shall* grant relief from the stay provided under subsection (a) of this section such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> >
> > (2) with respect to a stay of an act against property, if—
> >
> > > (a) the debtor does not have an equity in such property; and
> > >
> > > (b) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d) (Emphasis added); *In re Halvorson*, 102 B.R. 736, 737 (Bankr.D.N.D.1989); *In re Asbridge*, 66 B.R. 894, 898 (Bankr.D.N.D.1986); *In re Polries Bros.*, 49 B.R. 669, 673–674 (Bankr.D.N.D.1985). A party seeking relief under 11 U.S.C. § 362(d) only need establish one of the two alternative grounds for relief having only the burden of proof as to the issue of the Debtors' equity in the subject property. *In re Fenske*, 96 B.R. 244, 247 (Bankr.D.N.D. 1988); *In re Polries Bros.*, 49 B.R. 669, 674 (Bankr.D.N.D.1985) citing *In re Rouse*, 43 B.R. 380 (Bankr.E.D.Pa.1984); *see also United Savings Ass'n. v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

From the facts, and as conceded by the Debtors, it is apparent that the Ziebarth's do not have any equity in the real property securing the loan of FCB. The total indebtedness against the property as of the date of the petition is $483,087.10. While the value of the property is only $408,640.00. Therefore, once Farm Credit Bank established that they are an undersecured creditor under section 362(d), the burden shifts to the Debtors to establish that the real property at issue is "necessary to an effective reorganization". *In re Fenske*, 96 B.R. 244, 247 (Bankr.D.N.D. 1988); *In re Asbridge*, 66 B.R. 894, 899 (Bankr.D.N.D.1986); *see also, United Savings Ass'n. v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); 11 U.S.C. § 362(d). Obviously the subject real property is necessary for reorganization since it almost comprises the Ziebarths' entire asset base. However, a necessity for reorganization is not enough. *Timbers, supra*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Necessary to an effective reorganization requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*" *Id.* This

---

1979) as of March 14, 1990 is $123,812.80. The court took the liberty of analysing the possibility of reorganization using both figures.

**2.** FCB was granted judgments of foreclosure on both mortgages securing the subject property in

Civil case numbers 67CV87 617 and 68CV87 618 respectively. The judgments of foreclosure are pending appeal to the North Dakota Supreme Court.

standard requires that there must be a "reasonable possibility of successful reorganization within a reasonable time." *Id.* citing *In re Timbers of Inwood Forest Associates*, 808 F.2d 363, 370–371 (5th Cir. 1987). *See also, In re Fenske*, 96 B.R. 244, 247 (Bankr.D.N.D.1988); *In re Asbridge*, 66 B.R. 894, 899 (Bankr.D.N.D.1986) citing *In re Ahlers*, 794 F.2d 388, 399 (8th Cir. 1986). Therefore, the dispositive issue in this motion is whether there is a reasonable possibility of successful reorganization within a reasonable time.

### 4.

As compared with the Ziebarths' prior Chapter 11 case, the present Chapter 12 farming operation will undergo substantial changes. The most significant change in the operation, is the Ziebarths' decision to cease their livestock operation. The Ziebarths sold their entire cow/calf herd to a third party in December of 1989. Approximately the entire proceeds of the sale went to creditors holding a lien on the subject cattle. In place of raising livestock, the Ziebarths intend to develop a custom cattle feeding operation. The custom feeding operation entails the signing of contracts with other ranchers to provide feed and care for cattle in exchange for a predetermined price per pound increase in weight of such cattle. Ninety-nine percent of the risk of loss due to death or disease of the cattle is on the custom feeding operator. The Ziebarths also intend to grow cash crops such as hard red wheat, oats, and barley. Some of the crops will be utilized in the custom feeding operation supplemented with alfalfa and hay which will also be grown by the Debtors. The Debtors also plan to place 900 acres in the Conservation Reserve Program (CRP) for an additional income source.

### 5.

A detailed look at the projected income and expenses of the Ziebarths' operation, as provided by the Debtors in their "Chapter 12 Feasibility Projection" for 1990, is as follows:

## CHAPTER 12 FEASIBILITY PROJECTION

**Annual Income**

| | |
|---|---|
| Crop Sales | $ 60,125.00 |
| Government Payments | 11,100.00 |
| Custom Bull Calf Operation | 30,000.00 |
| Conservation Reserve Payments | 30,600.00 |
| Off Farm Trucking Income | 5,000.00 |
| TOTAL INCOME | $136,825.00 |

**Annual Expenses**

| | |
|---|---|
| Feed | $ 14,000.00 |
| Veterinarian | 2,000.00 |
| Seed | 700.00 |
| Repairs | 2,500.00 |
| Fertilizer and Chemical | 2,500.00 |
| Fuel | 4,500.00 |
| Taxes | 2,490.00 |
| Insurance | 2,850.00 |
| Utilities | 3,500.00 |
| Truck Expense | 3,000.00 |
| Supplies | 4,000.00 |
| Rent | 5,860.00 |
| Contract Labor | 6,000.00 |
| TOTAL EXPENSES | $ 53,900.00 |
| Family Living | $ 15,000.00 |
| Net Available for Debt Service | $ 67,925.00 |

From the above figures, the Debtors assert that there will be $67,925.00 available for debt service to fund their Chapter 12 plan. In order to determine the feasibility and probability of these projected income and expense figures, the court will discuss the income and expense figures separately and compare them to historical financial data of the Debtors' operation.

### a. *Projected Income*

The Ziebarths project that the major income producer for their farming operation will be from the sale of crops. The Debtors project that the sale of the crops will produce $60,125.00 worth of gross income. It is the Ziebarths' intention to allocate the crops as follows:

| Crops | Acres Planted |
|---|---|
| Wheat | 450. |
| Oats | 100 |
| Barley | 50 |
| Alfalfa/Hay | 60 |
| Milo/Sorghum | 40 |

The Debtors assert that from the allocated crop acres and assuming normal rainfall they can produce their projected gross crop income.

The court was also favored with the testimony of Dr. Cole Gustafson.[3] Dr. Gustafson testified as to the probability of the Ziebarths attaining their projected levels of gross income from the sale of crops. Dr. Gustafson concluded that from the acreage allocated, the proven yields, and assuming normal rainfall, the Debtors could expect to produce the following income results:

| Crops | Acres Planted | Bushels | Revenue | Government Payments | Total Income |
|-------|---------------|---------|---------|--------------------|--------------|
| Wheat | 450 | 11,250 | $40,375 | $5,625 | $46,000 |
| Barley | 100 | $1,650 | 3,330 | 792 | 4,122 |
| Oats | 50 | 2,750 | 3,330 | 670 | 4,000 |
| TOTAL | 600 | – | $47,035 | $7,087 | $54,122 |

Dr. Gustafson did not consider the hay and alfalfa, because those crops were to be used in the custom feeding operation, and therefore, any income realized under crop sales would be offset by an equal expense under the custom feeding operation. As the above figures reflect, the Debtors' projections for gross crop income plus government payments are approximately $16,000 greater than that of Dr. Gustafson's.

The next largest projected revenue producer is from the Conservation Reserve Program (CRP) acres enrolled in by the Debtors. The income produced from CRP will be $30,600.00. This appears to be stable income that is not disputed by FCB.

The next largest projected revenue producer is the custom feeding operation the Ziebarths intend to operate. The Debtors have no contract signed confirming the viability of a market for custom feeding or the income projected. However, Mr. Ziebarth testified that he has had negotiations with a rancher in Arkansas who is interested in doing business with him. The Ziebarths project that the custom feeding operation will produce a gross income of $30,000.00. The Ziebarths intend to supply custom feeding for 100 to 120 bulls for 365 days a year. The Ziebarths project that they will be paid 45¢ per pound increase in weight of the bulls. In order to produce $30,000.00 in gross income, the Debtors would have to provide custom feed to 73 bulls, 365 days a year, and each bull would have to gain at least 2.5 pounds a day.

Dr. Gustafson further testified on the feasibility of the Debtors' proposed custom feeding operation. Dr. Gustafson stated that in his dealings with ranchers in the area the average compensation for custom feeding is 35¢ to 37¢ per pound. The expected weight gain in western North Dakota for bulls is between 1 to 2 pounds per day with a 1.67 pounds per day average. Therefore, using Dr. Gustafson's average projections for this region, in order to produce $30,000.00 in gross income the Ziebarths would have to provide custom feed for 137 bulls, 365 days a year, and each bull would have to gain at least 1.67 pounds per day. These income figures for the custom feeding operation do not take into account any losses due to disease or death of the cattle. Mr. Ziebarth testified that it is common in custom feeding that the owner of the livestock will only bear 1% of the loss due to death or disease. Mr. Ziebarth also testified that in recent history he has had a high calf mortality rate. Moreover, there are several custom feed operations in the Ziebarth's region which will provide competition for their operation.

The final income projection was $5,000.00 for off farm trucking income. No testimo-

---

**3.** Dr. Cole Gustafson has been employed by North Dakota State University as an agricultural economist for three and one-half years. Dr. Gustafson holds a Bachelor of Arts Degree in Agri–Business from the University of Minnesota, a Masters Degree from the University of Minnesota and a PhD from the University of Illinois.

ny or evidence was received to determine the probability of this projection and therefore, this will be taken at face value.

While the court realizes that the Debtors' farming operation will undergo significant changes, the court finds the historical financial data of the Debtors' operation instructive. The first disclosure statement from the Debtors' prior Chapter 11 bankruptcy case (Exhibit 8) and the Debtors' income tax returns (Exhibit 7) reveal the following gross income levels for the prior four years:

| Year | Gross Income |
|------|-------------|
| 1985 | $299,769.00 |
| 1986 | $173,327.00 |
| 1987 | $135,527.00 |
| 1988 | $ 79,133.00 |

In addition, the Debtors projected 1989 income at $140,540.00 while their actual income for 1989 was only $60,160.00. These numbers reveal that the Debtors have not been able to produce their projected 1990 gross farm income for the last three years. While the court is aware of the drought situation in western North Dakota for the last two years, a debtor must be mindful that a plan of reorganization must strive to be feasible not only in good years but also in poor years. The court will next analyze the Debtors' projected expenses.

### b. *Projected Expenses*

The Debtors project total farm expenses to be $53,900.00. Under their new operation the Debtors intend to increase their seeded acres from 390 acres, to 575 acres under their revised Chapter 12 operation. However, the Debtors' projected expenses for crops drops from $32,960.00 to $29,800.00. This appears unlikely and was virtually unexplained by the Debtors. Furthermore, the Debtors have failed to allocate any money for expenses due to obligations for holding acres in the CRP program (i.e., weed control, grasshopper control). The Debtors' appraiser, Robert Penfield, testified that the Debtors would be "dreaming" if they expected to have no expense from the CRP acres. Mr. Penfield

suggested in his appraisal report that the CRP maintenance expense could run $7,490.00 or roughly 25% of income. In addition, the Debtors have failed to allocate expenses for income taxes, social security taxes, trustee's fees, and interest on their operating loan. Again, a look at the Debtors' historical expenses for their operation is instructive.

| Year | Expense |
|------|---------|
| 1985 | $158,487.00 |
| 1986 | $149,176.00 |
| 1987 | $163,200.00 |
| 1988 | $ 79,223.00 |
| 1989 | $ 77,700.00 (projected) |

The historical data on expenses reveals that the Debtors, over the last five years, had expenses in excess of what is now projected under their feasibility projections. The court is mindful that the Debtors' decision to cease their cattle operation will result in lower expenses, however, this court does place value in the historical expense figures especially when compared with the correlating gross income figures.

The Debtors project living expenses of $15,000.00 ($1,250.00/month). However, the historical data reveals that over the last four years the Debtors had average living expenses of approximately $19,200.00 per year. This translates into a difference of approximately $4,000.00 per year.

As a whole, the court finds the Debtors' expense figures as very optimistic. Moreover, the projected expense figures are wholly lacking in failing to account for items such as income taxes, social security taxes, trustee's fees and interest on their 1990 operating loan.

### c. *Funds Available for Debt Service*

The Debtors project that they will be able to produce $67,925.00 annually for debt service from their revamped farming operation. The historical data reveals that in the last five years, the Ziebarths only once produced income sufficient to meet their 1990 projections for debt service.

|  | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Income | $299,769 | $173,327 | $135,527 | $79,133 | $60,160 |
| Farm Expense | 158,487 | 149,176 | 163,200 | 79,223 | 77,700* |
| Living Expense | 19,200 | 19,200 | 19,200 | 19,200 | 19,200 |
| Available for Debt Service | 141,282 | 24,151 | (27,673) | (90,000) | (17,540) |

* projected

---

Due to the Debtors' prior performance this court is unpersuaded that the Ziebarths can have such a drastic turnaround in their operation to fund any Chapter 12 reorganization. However, even assuming arguendo that the Debtors' projections (Exhibit 15) are completely valid and realistic, they would still be incapable of an effective reorganization.

### 1. Analysis of Reorganization A.

The Debtors project $67,925.00 available for debt service. However, this number is insufficient to cover all the payments necessary to reorganize their operation.

| | |
|---|---|
| Available to Service Debt | $67,925 |
| Payment to Farm Credit Bank | $53,122 [4] |
| Payment to Dakota Western Bank | $10,629 |
| Payment for Past–Due Real Estate Taxes (1988, 1989) (assuming no interest & penalties) | $ 1,664 per year for 3 years |
| SUB–TOTAL | $ 2,510 |

The expenses which the Debtors submit only leave $2,510.00 in which to pay any income taxes, social security taxes, trustee's fees, and interest on a $30,000 operating loan made to the Debtors by Jay Depew. Any of these expenses individually could be greater than the balance projected. Therefore, even if the Debtors' projected income and expenses are correct, the Debtors would be incapable of servicing their debt and thus, would not have a reasonable likelihood of reorganization.

The court notes that the Debtors have filed a proposed Chapter 12 plan of reorganization dated March 22, 1990. The projected income and expense figures under the proposed Chapter 12 plan are the same as the figures utilized by the Debtors

in the "Chapter 12 Feasibility Projections" introduced at the motion for relief from stay hearing on March 14, 1990. The only difference is the sum available for debt service has been reduced by $2,500.00 which represents the Debtors' projected interest expense on the 1990 operating loan. Therefore, using the proposed plan's income and expense figures, the Debtors would still be unable to service their outstanding debt.

| | |
|---|---|
| Available to Service Debt | $65,425 |
| Payment to Farm Credit Bank | $53,122 |
| Payment to Dakota Western Bank | $10,629 |
| Payment for Past–Due Real Estate Taxes (1988, 1989) (assuming no interest and penalties) | $ 1,664 per year for 3 years |
| SUB–TOTAL | $ 10 |

This would leave a balance of $10.00 out of which payments for income. taxes, social security taxes, trustee's fees, and expenses for the CRP acres would need to be deducted. The court believes that the $10.00 balance is insufficient to cover the expenses for which the Debtors have failed to account. In addition, the plan is unclear as to where the revenue will come from to pay off the 1990 operating loan which purports to be unimpaired.

### 2. Analysis of Reorganization B.

The Debtors project $67,925.00 available for debt service. However, this number is insufficient to cover all the payments necessary to reorganize their operation.

| | |
|---|---|
| Available to Service Debt | $67,925 |
| Payment to Farm Credit Bank | $47,094 [5] |
| Payment to Dakota Western Bank | $10,629 |
| Payment for Past–Due Real Estate Taxes (1988, 1989) (assuming no interest & penalties) | $ 1,664 per year for 3 years |
| SUB–TOTAL | $ 8,538 |

---

4. FCB testified that the Ziebarths would qualify for a tier 3 interest rate of 12.25%. Therefore, the payment was computed on a principal balance of $408,640 at 12.25% for 25 years.

5. FCB testified that the Ziebarths would qualify for a tier 3 interest rate of 12.25%. Therefore, the payment was computed on a principal balance of $362,172.51 ($238,359.71 + $123,812.80) at 12.25% for 25 years.

The expenses which the Debtors submit only leave $8,538.00 in which to pay any income taxes, social security taxes, trustee's fees, and interest on a $30,000 operating loan made to the Debtors by Jay Depew. Any of these expenses individually could be greater than the balance projected. Therefore, even if the Debtors' projected income and expenses are correct, the Debtors would be incapable of servicing their debt and thus, would not have a reasonable likelihood of reorganization.

Again, analyzing the debt service under the proposed plan's income and expense figures, the Debtors would still be unable to service their outstanding debt.

| | |
|---|---|
| Available to Service Debt | $65,425 |
| Payment to Farm Credit Bank | $47,094 |
| Payment to Dakota Western Bank | $10,629 |
| Payment for Past–Due Real Estate Taxes (1988, 1989) (assuming no interest and penalties) | $ 1,664 per year for 3 years |
| SUB–TOTAL | $ 6,038 |

This would leave a balance of $6,038.00 out of which payments for income taxes, social security taxes, trustee's fees, and expenses for the CRP acres would need to be deducted. The court believes that the $6,038.00 balance is insufficient to cover the expenses for which the Debtors have failed to account. In addition, the plan is unclear as to where the revenue will come from to pay off the 1990 operating loan which purports to be unimpaired.

The court notes that the plan payments are different from those asserted by the Debtors at the motion for relief from stay hearing. However, the court is procedurally not in a position to discuss the proposed plan, the proposed plan payments, or their conformance with the provisions of Chapter 12. The court's sole reasoning for referencing the proposed Chapter 12 plan is to demonstrate the projected income and expense figures are virtually identical to those utilized in the motion for relief from stay hearing. The court believes that these same figures are unrealistically optimistic and the Debtors have failed to account for unavoidable expenses.

A party in interest is free to move for dismissal or relief from stay at any time and may pursue such remedies even within the 120 day filing period. *In re Fenske*, 96 B.R. 244, 247 (Bankr.D.N.D. 1988). A debtor does not have the luxury of waiting until an eventual confirmation hearing to establish the likelihood of reorganization but must be prepared to meet the movant's evidence. *Id.* at 248.

The court realizes that FCB's relief from stay motion was brought before the expiration of the exclusive 120 day period in which a debtor may file a plan of reorganization. The court is also mindful that the burden on the Debtors during the early stages of this Chapter 12 proceeding are less than at a confirmation hearing. However, even with the less demand of a detailed showing during these first four months in which the debtor is given exclusive right to put together a plan, section 362(d)(2) relief is required when there is a lack of any realistic prospect of effective reorganization. *Timbers*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *see also, In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108, 109 (Bankr.W.D.Tex. 1987) (immediately after the bankruptcy filings); *In re New American Food Concepts, Inc.*, 70 B.R. 254, 262 (Bankr.N.D. Ohio 1987) (three months); *In re 6200 Ridge, Inc.*, 69 B.R. 837, 843 (Bankr.E.D. Pa.1987) (three months); *In re Park Timbers, Inc.*, 58 B.R. 647, 651 (Bankr.Del. 1985) (two months); *In re Bellina's Restaurants II, Inc.*, 52 B.R. 509, 512 (Bankr. S.D.Fla.1985) (one month); *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 641 (Bankr.E.D.N.Y.1980) (four months); *In re Terra Mar Assoc.*, 3 B.R. 462, 466 (Bankr. Conn.1980) (two months).

Feasibility projections must be based upon objective facts. *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985). Sincerity, honesty and willingness are not sufficient to make a plan feasible, and neither are any visionary promises. *Id.* at 420. The court finds the Ziebarths' proposed feasibility projections unrealistically optimistic and the expenses are wholly lacking. The operation appears problematic and the figures of income and expenses appear to be conjecture at best. The Debtors have been under the protection of bankruptcy for approximately two years. During that period

the Ziebarths have failed to produce a confirmable plan of reorganization. In addition, during the two year period the Debtors have not made any payments to Farm Credit Bank on the subject mortgages. Yet even without rent payments, it appears the Debtors have no cash reserves but must obtain an operating loan for the upcoming farm season. This appears to be further evidence of the Debtors' inability to produce sufficient cash flow from their operation.

Therefore, this court finds that the Debtors lack equity in the subject real property and that the proposed operation appears to have no reasonable possibility of successful reorganization within a reasonable time.

Accordingly, pursuant to 11 U.S.C. § 362(d)(2) Farm Credit Bank's motion for relief from stay is GRANTED.

IT IS SO ORDERED.