**In re Tom ASBRIDGE, Debtor.**

**Bankruptcy No. 86–05533.**

United States Bankruptcy Court,
D. North Dakota.

Oct. 15, 1986.

Sean Smith, Bismarck, N.D., for Federal Land Bank.

U.S. Trustee William Westphal, Minneapolis, Minn.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a Motion for Relief from Stay, filed on July 24, 1986, by Federal Land Bank of St. Paul (FLB), as to approximately 6,330 acres owned by Tom Asbridge (Debtor) and his wife, Laura.

The Debtor filed his petition commencing this Chapter 11 proceeding on June 18, 1986. The Debtor and his wife (Debtors) previously filed for Chapter 11 on March 30, 1984, but obtained a voluntary dismissal of that case on April 15, 1985. Federal Land Bank had filed a Motion for Relief from Stay as against this same property prior to the time that the first bankruptcy was dismissed. The Debtors also commenced another Chapter 11 case on February 10, 1986, which this court dismissed on April 30, 1986, over the Debtors' objections. The case was dismissed for cause pursuant to section 1112(b) for the reason that it was not filed in good faith. *In re Asbridge,* 61 B.R. 97, 103 (Bankr.D.N.D.1986). This court concluded that the sole purpose for the Debtors' second filing was to forestall legitimate efforts of secured creditors and that very little positive change, if any, had occurred in the Debtors' financial circumstances since the previous filing. *Id.,* at 102.

Shortly after the petition commencing the Debtor's third Chapter 11 case, the instant case, was filed, FLB again moved for dismissal. A hearing on the Motion to Dismiss was held on August 13, 1986, at which time this court determined that the Debtor's petition was filed in good faith, as there had been a substantial change in the Debtor's financial condition since the previous filing and that the Debtor had a reasonable chance of reorganizing. FLB seeks relief from stay or in the alternative, adequate protection.

A hearing on the Motion for Relief from Stay was held before the undersigned on September 16, 1986. The facts, as material to this matter, are as follows:

### FINDINGS OF FACT

The Debtor is a rancher in southwestern North Dakota. His operation consists of approximately 6,330 acres, all of which are presently in range land or hay land, although some are suitable for tillage and crop production.

Subsequent to the previous dismissal and prior to the time the petition commencing this bankruptcy was filed, the Debtor entered into substantial negotiations with the First Bank of Lemmon, South Dakota, wherein First Bank released in excess of $1,000,000.00 of debt in exchange for the Debtor turning over his cattle which were secured by First Bank. The Debtor still has most of his machinery, which apparently has a value of $29,000.00. His only substantial creditor remaining is Federal Land Bank.

The Debtor presently owes Federal Land Bank $1,006,486.19 with interest accruing at a per diem rate of $326.28. The amount which the Debtor has owed FLB at various times is as follows:

| Occasion | Date | Amount of Debt |
|---|---|---|
| First Filing | 3–31–84 | $742,216.59 |
| Second Filing | 2–10–86 | $936,662.27 |
| Third Filing | 6–18–86 | $978,099.83 |

In addition, the following real estate taxes have not been paid by the Debtor:

| | |
|---|---|
| 1983 real estate taxes | $ 8,129.59 |
| 1984 real estate taxes | $ 8,841.76 |
| 1985 real estate taxes | $ 7,116.18 |
| Total Taxes Unpaid | $24,087.53 |

Apparently, FLB has paid the 1983 taxes.

FLB obtained a judgment of foreclosure against the Debtor's property on January 17, 1986. This judgment has subsequently been appealed to the North Dakota Supreme Court. A sheriff's sale was scheduled for March 11, 1986, but was stayed by the Debtors' bankruptcy filing on February 19, 1986. Following dismissal of the Debtors' second bankruptcy, another sheriff's sale was scheduled for June 18, 1986. This sale was stayed by the filing of the Debtor's present bankruptcy.

The Debtor does not own any cattle now, nor have cattle been grazing on his ranch since the most recent bankruptcy filing. The Debtor has, however, spent the entire summer and fall haying his land and has "put up" between 800 to 1,000 tons of hay. This hay has a value of between $20 and $50 per ton if sold. However, the demand for hay appears to be quite weak at this time. A buyer's market for hay currently exists because of the large hay crop in western North Dakota this year. Moreover, the Debtor's ranch is not easily accessible for transporting hay. Consequently, the Debtor believes that he will receive the maximum return for his hay by feeding it, on location, to cattle. The Debtor proposes to enter into custom feeding cattle agreements, whereby he will feed cattle for cattle owners. The Debtor hopes to be feeding cattle by November or December of this year. Although all details have not yet been worked out, at this time a two-season feeding operation appears to be most desirable. Apparently hay would be fed one group of cattle during the winter months and another group would graze during the summer months. Although the Debtor did not have any concrete feeding agreements made as of the hearing date, he testified that it was too premature to have agreements for winter feeding already made. The Debtor believes that he will be able to reorganize his operation by

custom feeding cattle for their owners. Although the Debtor was not able to provide the court with specifics concerning the potential for a profitable custom feeding operation, the court does have confidence in the Debtor's ability and his contacts within the cattle business. This hope of the Debtor's appears to be more than a pipe dream and the court believes the Debtor has a realistic possibility of obtaining these contracts.

Robert Wingenbach, director of special credit for Farm Credit Services of Bismarck-Mandan, which is the management portion of FLB, has been working with the Debtor's loan with FLB for over one year. Wingenbach testified that if FLB were able to foreclose on the Debtor's real estate, and subsequently obtain possession of that property following a redemption period, it would try to sell the property and reinvest the proceeds in FLB's current loan fund at 12½%. Wingenbach testified that FLB generally receives 90% of the market value on properties which it sells. FLB did not present any evidence as to when it would have been able to sell the Debtor's property if it were able to foreclose.

Testimony from several witnesses clearly establishes that the farm economy in the Debtor's vicinity is very weak. FLB currently is holding a 1,600 acre property in Grant County, the county in which the Debtor's property is located. Not many people in the area are requesting new loans, which Wingenbach believes is probably caused by the lack of cash for a downpayment, inability to service debt, and poor cash flow generally. Only two new real estate loans have been made by Federal Land Bank in Grant County during the six weeks preceding the hearing. Wingenbach was not aware of Federal Land Bank recently making any new loans in Morton or Sioux counties, both of which border Grant County.

Most of the ranch real estate properties which are being purchased are financed. At least a 20% cash down payment is required by Federal Land Bank, although a 35% cash down payment appears to be the norm. FLB would finance the Debtor's property to a qualified purchaser on these terms.

In view of the size of the Debtor's ranch and the lack of interest in purchasing agriculture properties, particularly ranch properties, the court seriously doubts whether FLB, if it had possession of the Debtor's ranch today, would be able to sell it within the near future. A ranch of this size would not normally be purchased as an addition to surrounding ranches, but would be bought as a complete ranch unit. Financing for such a venture is difficult to obtain even if an interest in obtaining financing, or the property, did exist.

Bill Knudson, an expert appraiser, valued the Debtor's ranch at $690,000.00. Disagreeing, the Debtor urges a valuation based on production ability rather than market value, a method required by the Code. Knudson also testified as to the annual rental income which could be derived from the Debtor's land. Knudson felt the property could be rented at the following rates:

| Acres | Description | Rental Value |
|---|---|---|
| 278.3 | good crop land | $15.00 per acre |
| 650.9 | average-good crop land | $12.50 per acre |
| 362.0 | average crop land | $10.00 per acre |
| 5,035.34 | prairie | $ 6.00 per acre |

The rental rates estimated by Knudson, as to the crop land, are based on the highest and best use of the property, not the present use. The land is all presently in grass and is either used for grazing or hay land. Knudson's basis for determining the rental value of the property is somewhat unfounded. If the land would be rented out for small grain production it would need to be broken from sod and brought into farming condition. Breaking costs, and the time involved, were not considered when Knudson made his rental value determination. In addition, United States Department of Agriculture crop subsidies are an important part of grain crop income and it is important that tillable acreage have a

crop base attached to it so that the land qualifies for subsidy payments. Knudson's comparable properties renting for $15.00 per acre were already broken and included subsidy payments. Knudson does not know if the Debtor's property is eligible for the United States Department of Agriculture payments and if it has a tillable base; being in grass, the court questions whether in fact the land does have a tillable base and whether it can be broken and qualify for government payments. Knudson's information pertaining to rental values was not derived from any properties within ten miles of the Debtor's ranch.

Lloyd Stewart, a neighbor of the Debtor and a supervisor for the Grant County Soil Conversation District, ranches near the Debtor's property. Stewart has testified before this court on previous occasions and his opinion is highly regarded by the court. Stewart testified that FmHA says the break-even rate for pasture land is $2.80 per acre. Stewart has some rented for $3.00 per acre. While land is often purchased for more than the particular land itself is capable of cash flowing, a producer has no incentive to pay more for rental property than the producer can earn on that property within the rental period. The Debtor believes that the rental value of his land is $3.28 per acre. Although the Debtor was not clear as to whether he believed this rental value applied to the entire land or just to the range land, the court believes he intended it to apply to the range land.

Based upon the evidence before it, the court concludes that the yearly rental value of the 5,035 acres of range land is $3.50 per acre. The remaining land, although tillable, is currently in grass. Obviously, a potential lessee would not spend the time and money breaking the land and preparing it for grass production, unless he had some assurance of renting it for a number of years. If FLB had possession of the property, it would attempt to sell it, and would probably not enter into a long-term lease arrangement in the interim. Thus, the property would likely not be farmed, and would stay in its present use until it was eventually sold. Moreover, without an es-

tablished crop base and assurances that the property could be broken, and that it would qualify for government payments, its rental value would be further reduced. Accordingly, the court believes the average rental value of the remaining 1,291 acres, as hay land, is $7.00 per acre. The home and farm buildings also have a rental value of $300.00 per month. Thus, the total annual rental income available from the Debtor's property, based on present conditions, is as follows:

| Property | Value Per Unit | Rental Income |
|---|---|---|
| 5,035 acres | $3.50 per acre | $17,622.50 |
| 1,291 acres | $7.00 per acre | $ 9,037.00 |
| Buildings | $300.00 per month | $ 3,600.00 |
| TOTAL YEARLY RENTAL INCOME | | $30,259.50 |

## CONCLUSIONS OF LAW

Section 362(d) of the Bankruptcy Code provides that the court shall grant relief from stay—

(1) for cause, including the lack of adequate protection of an interest in property of such a party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

### 1. Relief From Stay Under 362(d)(2)

FLB is seeking relief from stay under both section 362(d)(1) and 362(d)(2). The court will first consider whether relief is available pursuant to section 362(d)(2).

The parties agree that no equity exists in the property. Therefore, the first element of relief under section 362(d)(2) is established. The other element, that the property is not necessary to an effective reorganization, is a point which is disputed. FLB agrees that the real property is essential to attempt to formulate a plan of reorganization, but believes that the debtor has not established that an effective reorganization is a realistic possibility. The Eighth Circuit

recently adopted other court interpretations of the "necessary for an effective reorganization" requirement as requiring a debtor to not only show that the property is essential to reorganization, but that an effective reorganization is realistically possible. *In re Ahlers*, 794 F.2d 388, 399 (8th Cir.1986).

As of the date of hearing, this bankruptcy has been in effect for approximately three months. On August 13, 1986, the debtor prevailed on a Motion to Dismiss filed by FLB, at which time the court held that a substantial change in the Debtor's operation and financial condition had occurred since the Debtor's earlier bankruptcy case was dismissed, and that the Petition in this case was filed in good faith. At that hearing, the Debtor's plans were the same as they are presently—to enter into a custom feeding operation.

Although the Debtor has been in and out of bankruptcies since 1984, the current petition is only three months old. The Debtor's prospects of a successful reorganization are far from certain at this time. Nevertheless, when this court determined a month ago that the Debtor had not filed in bad faith, it follows that the Debtor believes in good faith that he has a reasonable change of reorganizing. Three months is too soon, in this instance, to determine that an effective reorganization is impossible. The Debtor has been putting up hay all summer and only now is the time approaching for him to market that hay via custom feeding of cattle. A custom feeding operation is not only a tool by which to market the Debtor's hay, but is also an option by which the Debtor hopes to be paid for his management and husbandry abilities. The Debtor is a very capable husbandman and is well connected in the livestock business. Consequently the court believes that an effective reorganization is realistically possible. Therefore, the second requirement for relief from stay pursuant to section 362(d)(2) has not been met.

FLB also argues that if it made a section 1111(b) election, the Debtor would be unable to reorganize. This point is meritless for two reasons. First, FLB has not made an 1111(b) election. A bankruptcy court would be tied in knots if all potential, hypothetical, problems were considered and ruled upon. Current problems are more than enough to keep the court occupied.

Secondly, and more important however, is that if FLB makes an 1111(b) election, and wishes to have its entire claim secured, the Debtor's plan must meet two requirements. First, FLB must receive the full value of its claim, dollar for dollar, over time. Secondly, these payments must have a present value determined, as of the effective date of the plan, of at least the value of FLB's interest in its collateral. 5 Collier on Bankruptcy ¶ 1111.02[5] (15th Ed. 1985). Thus, the court does not believe that an 1111(b) election would cause substantial additional difficulty for the Debtor in obtaining a confirmed plan.

### 2. Relief From Stay For Lack Of Adequate Protection.

#### a. Opportunity Cost

The other basis for FLB's motion is section 362(d)(1) of the Bankruptcy Code. This section provides that the court shall grant relief from stay for cause, including the lack of adequate protection of an interest in property of such a party in interest. Adequate protection is not specifically defined by the Code. However, it is a flexible concept which requires bankruptcy courts to make decisions as to whether creditors' interests are "adequately protected" on a case-by-case basis. *In re Briggs Transp. Co.*, 780 F.2d 1339, 1349 (8th Cir.1985). Adequate protection "is intended to encompass a broad range of creditor interests and does not mandate an interpretation of the creditors' interest as the whole of the economic bargain". *Id.*, at 1345. This court has, on a number of occasions, held that, at a minimum, a creditor is entitled to have the value of its collateral, determined as of the date of filing, protected against depreciation beyond the point where the value of the collateral would no longer exceed the creditor's claim. *In re Polries,*

49 B.R. 669, 674–675 (Bankr.D.N.D.1985); *In re Wolsky,* 46 B.R. 262, 265 (Bankr.D.N.D.1984) (remanded on opportunity costs issue).

This court's previous notions concerning adequate protection have recently been tempered by the *Ahlers* case. In view of *Ahlers* and *Briggs,* the court will re-establish its position concerning the interests in need of adequate protection, the date or dates when this interest is valued, and the nature of adequate protection required.

■ The Eighth Circuit in *Ahlers* set forth adequate protection standards which provide secured creditors in bankruptcy with the same level of protection that they would have outside of bankruptcy. *Ahlers,* 794 F.2d, at 396. The adequate protection issue in *Ahlers* principally involved adequate protection for lost opportunity costs. It was in this context that the court held that, in fashioning adequate protection payments, a bankruptcy court must determine: (1) The date when the creditor, absent the bankruptcy filing, could have taken possession of the collateral under state law *and* could have sold it to a third party; (2) the amount that the creditors could have realized at the sale, and (3) the creditors expected return upon reinvestment. *Id.* Payments to protect a creditor's right to a reinvestment return on foreclosure proceeds, which is lost opportunity costs, should not begin until, under state law, the creditor could have taken possession of the collateral, sold it to a third party, and reinvested the proceeds. *Id.* This is the same approach which this court has used, pre *Briggs* and pre *Ahlers,* in fashioning adequate protection payments for lost opportunity costs. *In re Wolsky,* 53 B.R. 751, 755–56 (D.N.D.1985). The first step, however, preparatory to determining the usual foreclosure delays, is to determine a date to which these delays will be added. *Ahlers,* 794 F.2d, at 396. In the instant case, this determination is simplified because a judgment has already been entered and a sheriff's sale had already been scheduled. Thus, the most certain date to which the normal delays shall be added, would be June 18, 1986, which is the date on which the foreclosure sale was scheduled.

Under North Dakota law, a debtor has a year redemption period following foreclosure of farm real property during which time he is entitled to the rents and profits from the property. N.D.Cent.Code § 28–24–02 (Supp.1985). In the instant case, however, FLB's judgment has been appealed by the Debtor to the North Dakota Supreme Court. If the judgment is upheld, the date from which adequate protection for lost opportunity cost could be most accurately measured would be June 18, 1986. However, if the judgment is reversed, then FLB would be in the same situation as are many real estate creditors in bankruptcy cases; FLB would have a pending foreclosure action with no final judgment.

In circumstances when a foreclosure has been commenced but no final judgment has yet been rendered, this court must add the usual foreclosure delays on to the date the action was begun, to arrive at the date when adequate protection for lost opportunity cost must be provided. A minimum of fifteen months occurs from the beginning of a foreclosure process through the redemption period. Foreclosure is begun in North Dakota by serving a notice of foreclosure, at least thirty days before formal commencement of an action, upon the debtor. N.D.Cent.Code § 32–19–20 (1976). A summons and complaint may then be served upon the debtor/defendant. *Id.* The debtor has twenty days to serve his answer upon the foreclosing party. N.D.R. C.P. 12(a). Assuming that the defendant does not answer, then the plaintiff would obtain a default judgment. Once a judgment is entered, the creditor must give notice of the sale once a week for three successive weeks, the last publication to be at least ten days prior to the making of such sale. N.D.Cent.Code § 28–23–04 (1974). To this date is added the one-year redemption period. Assuming that a creditor would follow reasonable and established marketing techniques, it would purchase the realty at the foreclosure sale, and

then attempt to resell the property after the redemption period had expired. *In re Ahlers*, 794 F.2d, at 397. Thus, a creditor would not obtain a present possessory interest in the real property until a minimum of approximately fifteen months following commencement of the foreclosure process. If no action has yet been commenced, this time period is added to the date that the creditor moved for relief from stay.

■ FLB believes that delays caused by state court defenses or appeals should not be considered as part of the normal delay period because the *Ahlers* court only considered the statutory period of redemption and the statutory publication time requirements. The reason that the *Ahlers* court considered only statutory delays, is because the record did not include any evidence of delays, statutory or otherwise. If a debtor establishes that additional delays would have occurred, the additional delays must be added on to minimal statutory delays. For purposes of determining a date beyond which adequate protection payments must be made, no legitimate distinction can be made between delays caused by notice, redemption period, appeals, or various defenses. These additional delays, regardless of the cause for them, would have occurred in state court, but for the bankruptcy, and thus the Debtor should not be held to protect creditors against them during bankruptcy.

Once a motion for relief from stay based upon lack of adequate protection is filed, the parties may stipulate as to an initial hearing date when the court can consider whether to further extend the "normal delay" period or if no substantial additional delays would have occurred, to then consider whether the interest is adequately protected. If the parties stipulate to scheduling an initial hearing, the matter will be continued to that time. A stipulated date for an initial hearing would not prejudice creditors from presenting testimony as to additional delays, unless so stipulated to. The court may take testimony to determine if the period should be further extended because of additional delays caused by vari-

ous defenses, such as the confiscatory price statutes, which appear to be recognized by the North Dakota courts. N.D.Cent.Code 28–29–04—28–29–08 (1974), *see Heidt v. State*, 372 N.W.2d 857 (N.D.1985). If an additional delay in the foreclosure process would normally occur, the court will decide whether to make a determination on lost opportunity costs at the fifteen month hearing, or whether a future hearing should be set to make that determination. If the foreclosure period would not have been delayed further, then the court will hear testimony as to what opportunity costs, if appropriate, the creditors are entitled to have adequately protected. If the property would have been immediately sold, lost opportunity cost is the return on the investment of sale proceeds. *In re Wolsky* 53 B.R., at 757, 758. If a delay would normally occur before the property could be sold, then the lost opportunity cost is the rental income which a creditor would have received. Lost opportunity cost cannot include loss of interest income on sale proceeds if the property would not have been sold.

Accordingly, in the instant case, it is appropriate to schedule a hearing sometime after June 18, 1987, to determine what adequate protection payments for lost opportunity costs FLB would be entitled to or, if the judgment is reversed by the Supreme Court, to determine what additional delay, if any, should be included before an adequate protection determination for lost opportunity costs should be made.

#### b. *Decline in Value*

■ Both the bankruptcy court and district court decisions in *Ahlers* ordered payments of adequate protection for lost opportunity costs. Although the Eighth Circuit's holding principally concerned the time period when a creditor's interest should be valued for adequate protection of lost opportunity costs, it is clear that the *Ahlers* holding is also pertinent in determining when adequate protection must be provided for decline in value caused by market depreciation. The following lan-

guage from *Ahlers* indicates the broad scope of the *Ahlers* decision regarding adequate protection for decline in value:

> [T]he banks will be protected *from falling values* from the date that they could obtain possession of the property until the plan is confirmed ... and this period should ordinarily be more than sufficient to obtain confirmation or rejection of a plan. As for the loss that occurs *during the redemption period,* banks unfortunately will have to absorb this loss with or without a bankruptcy proceeding. Indeed, if a feasible plan is submitted and approved, the banks may realize more under reorganization than they could under liquidation. *This opinion simply recognizes reality.*

*Ahlers,* 794 F.2d, at n. 13. (emphasis added).

This court agrees with the Eighth Circuit's analysis. Why should a debtor in bankruptcy be required to protect a creditor from the decline in value of its realty when this decline would have occurred during a foreclosure action in state court anyway? By requiring farmer-debtors to make adequate protection payments for all post-petition decline in value of their real estate, a secured creditor would obtain a windfall in bankruptcy, at the expense of the debtor, which the creditor would not receive outside of bankruptcy. If a secured creditor were allowed adequate protection for decline in value *and* lost opportunity cost, a debtor's payments would probably be greater under bankruptcy than they were under the original mortgage. Such treatment would hardly give a debtor a reasonable chance of reorganizing.

In its analysis of when adequate protection payments begin, the *Ahlers* court appears to assume that the property could be sold immediately upon expiration of the redemption period. However, when evidence indicates that property would not have been sold immediately upon expiration of the redemption period, adequate protection for decline in value should not begin at the end of the redemption period. But for the bankruptcy, secured creditors would continue absorbing losses for decline in value until the property would have been actually sold. In the case at bar, twelve months from the date of the scheduled foreclosure sale is when, but for the bankruptcy, the redemption period would have expired. A hearing then can be scheduled for sometime shortly after that twelve month period. Regardless of when an initial hearing is held, however, the court will then consider evidence as to any further delays which should be added to that date. Adequate protection for property which is difficult to sell, such as the Debtor's in the instant case, may initially be based upon the rental value of the property because that is the sole lost opportunity cost until the property could have been sold. Adequate protection for decline in value may follow at some later time, beginning when the property could have been sold but for the bankruptcy.

Assuming that a plan of reorganization is confirmed, creditors are not harmed at all by being in bankruptcy under this court's procedure for determining adequate protection. Any losses for lost opportunity cost or for decline in value during the pre-fifteen month hearing would have occurred under state law anyway. If it appears to a creditor that a feasible reorganization is impossible or unlikely, the creditor may then move to have the case dismissed so that it may pursue its state court remedies. In the instant case, if the Debtor has not entered into substantial custom feeding contracts by next spring, he would have a difficult time convincing the court that any reasonable prospects for reorganization do exist.

The appropriate time in this instance to initially consider the issue of adequate protection for a decline in the value of the property will be sometime after June 18, 1987. If the state court judgment is upheld, this is the earliest point when FLB would have obtained possession of the property. At that time, we will determine when, but for the bankruptcy, FLB would have likely have been able to sell the property. The likely sale date is the point where the property is valued—thereafter FLB will be entitled to adequate protection for the decline in value of the property.

### 3. Relief From Stay For Cause

■ FLB also argues that relief from stay for cause pursuant to section 362(d)(1) should be granted unless the Debtor brings the delinquent real estate taxes current. Although the taxes are a couple of years delinquent, the property is several years away from being sold for taxes. Because FLB is not in any immediate risk of losing its collateral to the county, cause has not been established.

Accordingly, and for the reasons stated herein, Federal Land Bank's Motion for Relief from Stay will be continued to sometime after June 18, 1987, at which time this court will determine whether relief from stay is appropriate, because Federal Land Bank's interests are not adequately protected, or whether the motion should be further continued.

IT IS SO ORDERED.