**In re Arvel GLINZ and Marjorie Glinz, Debtors.**

**Bankruptcy No. 83–05121.**

United States Bankruptcy Court, D. North Dakota.

Feb. 10, 1987.

David Butler, Minneapolis, Minn., for Travelers Ins. Co.

Max Rosenberg, Roger Persinger, Bismarck, N.D., for debtors.

Daniel Wentz, Fargo, N.D., for Creditors Committee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

Before the court is a Motion For Relief From Stay filed March 13, 1986, by Travelers Insurance Company (Travelers). This motion, together with a debtors' motion for valuation was originally considered by this court in April, 1986, and a Memorandum and Order was entered on April 30, 1986, granting Travelers relief from stay against 4,620 acres of land situated in Stutsman County, North Dakota. On appeal, the United States District Court for this district remanded the motion back to this court for reconsideration in light of *In re Ahlers*, 794 F.2d 388 (8th Cir.1986).

By way of brief procedural background it will be recalled that the instant motion for relief from stay is the third to be filed in this case. The first, filed on February 9, 1984, resulted in an adequate protection payment of $288,000.00 being made by the debtors, Arvel and Marjorie Glinz (Debtors). The second, filed on January 9, 1985, resulted in an oral stipulation whereby the Debtors agreed to relinquish their interest in certain Pembina County property with a cash lease-back at the rate of $25.00 per acre and in consequence of retaining the Stutsman County property, the Debtors agreed to pay Travelers the sum of $132,988.00 by December 1, 1985, calculated at the rental rate of $29.00 per acre. Because of title difficulties with the Pembina land, the oral stipulation was not reduced to writing at the time whereupon Travelers renewed its motion on December 17, 1985, asking for relief from stay as well as a super priority claim for 1985 rents on the Pembina land and the unpaid adequate protection due December 1, 1985, on the Stutsman County land. The December motion came on for hearing on February 5, 1986, at which time the parties agreed to supplant their earlier oral stipulation with a new signed stipulation which was then filed with the court. The terms of the February

5, 1986 stipulation were essentially those of the earlier oral stipulation in that it required payment by December 1, 1985, of $64,050.00 as 1985 rent for the Pembina property and $132,918.60 as adequate protection on the Stutsman County property. The stipulation further provided that if payment were not made, the stay could be lifted against the Stutsman County property. The stipulation was approved by an Order entered February 26, 1986. This order in addition to approving the stipulation extended the payment deadline to February 20, 1986, and directed that a plan be confirmed by June 1, 1986.

On February 18, 1986, a payment of $196,968.00 was made by the Debtors.

On March 13, 1986, the motion now being considered was filed. By it, Travelers sought relief from stay as against the Stutsman County land, citing as reasons the failure of the Debtors to include in their February 18, 1986, payment interest for the period December 1, 1985, to February 18, 1986; non-payment of real estate taxes; no effort by the Debtors towards reorganization; continuing loss and depreciation; and delay prejudicial to creditors. A hearing was held on April 16, 1986, at which time the issue on adequate protection was further defined as being what, if any, adequate protection the Debtors should pay for use of the Stutsman County land for the 1986 crop season. At this hearing, valuation testimony was also taken and the Debtors made an oral offer of adequate protection of $10.96 per acre which was rejected by Travelers.

This court in response to the District Court's directive conducted a further hearing on February 3, 1987, to take whatever additional evidence the parties thought appropriate in light of *In re Ahlers*. This hearing on remand was held in conjunction with a recent motion by Travelers for dismissal—a matter being discussed by separate opinion.

## Findings of Fact

The facts as recounted from the April 17, 1986, hearing as well as the most recent hearing on remand are the following:

The property in question consists of 4,620 acres in Stutsman County, North Dakota and which is subject to two separate mortgages in favor of Travelers. The total indebtedness on the two mortgages as of March 18, 1983, was $2,410,672.00. By April 17, 1986, the total was $3,139,092.00. From expert valuation testimony taken at the 1986 hearing, the court concluded the value of the 4,620 acres to be:

$2,587,000.00 as of March 1, 1983

$1,418,000.00 as of December 1, 1985

$1,062,000.00 as of April 1, 1986

No further testimony was proffered as to land values or whether the decline evidenced in the earlier hearing is continuing other than a comment by Blaine Lenz, a finance officer with Travelers, to the effect that the market in central North Dakota is soft. From the earlier valuation testimony, it appears there was a 25% market decline in the four months between December 1, 1985, and April 1, 1986. Whether this decline has continued or at what rate is unknown. Mr. Lenz testified that at today's market price it is Travelers' policy not to dispose of repossessed real property but instead hold it for the long term, manage, and improve it with the idea of some day selling it when market conditions allow recovery of losses. North Dakota is not regarded by Travelers as a favorable lending market, but if loans were to be made in this state, the minimum rate would be 10.25% for a new loan to a prime borrower. Until sold, Travelers would rent out any land it held on a cash basis. According to Lenz, who had not done a detailed analysis of rentability of the Debtors' land, land in the general area is renting for between $20.00 and $30.00 per acre. The Debtor, Arvel Glinz, testified that it is difficult to get cash rent these days, but that one might expect to pay $16.78 per acre after taxes and $15.63 after crop insurance is figured in. Mr. Lenz acknowledged that Glinz's estimate was reasonable.

The 4,620 acres of Stutsman County land was cash leased to the Debtor's son and

son-in-law for the 1986 crop season on a 30% crop share basis. Arvel Glinz indicated that his intent for the 1987 season was to again lease out the land to these individuals.

### Conclusions of Law

Travelers' motion filed March 13, 1986, seeks relief from stay on the basis of section 362(d)(1). Although counsel's argument at the re-hearing might be regarded as raising a basis for relief under 362(d)(2), the motion itself does not raise section 362(d)(2)(B) as an issue nor was any evidence presented on the Debtors' ability to reorganize save for the recently filed Disclosure Statement and Plan and the testimony of Mr. Lenz who said he had never seen a farmer with land 100% financed without outside income, capable of cash flowing land payments soley from rental income. The main thrust of Travelers evidence as regards its relief from stay motion is lack of adequate protection under section 362(d)(1). The question of reorganizational ability will be discussed in the context of the companion dismissal opinion.

Section 362(d)(1) allows for relief from stay for cause including the lack of adequate protection of an interest in property of a party in interest. Adequate protection is a flexible concept which requires bankruptcy courts to make decisions as to whether creditors' interests are "adequately protected" on a case-by-case basis. *In re Briggs Transp. Co.*, 780 F.2d 1339, 1349 (8th Cir.1985). In its previous decision this court was of the opinion that adequate protection, while a flexible concept, nonetheless required at a minimum that a creditor's interest in the collateral be protected against any decline in value. It was from the viewpoint of collateral value decay rather than lost opportunity cost that the issue of adequate protection was originally considered by this court in its April 30, 1986, memorandum. The question as framed in the April 30, 1986, order was whether the Debtors' offer of $50,000.00 plus payment of the 1982 taxes was sufficient adequate protection for collateral val-

ue decline occurring between December 1, 1986, through April 17, 1986. As noted in the findings of fact, the Stutsman County land had experienced a decline of $356,-000.00 during this period, and this court opined that the offer did not even begin to shore up the decline. Hence, the requested relief was granted.

 Counsel for the Debtors suggested at the April, 1986 hearing that the *Briggs* case stood for the proposition that compensation for lost opportunity cost alone is sufficient adequate protection. At that time, this court did not agree with the Debtors but since writing its previous decision has modified its position in view of the subsequent case of *In re Ahlers.* The *Ahlers* decision principally involved adequate protection for lost opportunity costs but the appellate court suggested that decay of collateral value was considered at the time they addressed the concept of adequate protection:

> [T]he banks will be protected from falling values from the date that they could obtain possession of the property until the plan is confirmed.... and this period should ordinarily be more than sufficient to obtain confirmation or rejection of a plan. As for the loss that occurs during the redemption period, banks unfortunately will have to absorb this loss with or without a bankruptcy proceeding. Indeed if a feasible plan is submitted and approved, the banks may realize more under reorganization than they could under liquidation. This opinion simply recognizes reality.

*Ahlers,* 794 F.2d, at 400 n. 13. Following up on the foregoing concept this court in its decision of *In re Asbridge,* 66 B.R. 894 (Bankr.N.D.1986) said:

> This court agrees with the Eighth Circuit's analysis. Why should a debtor in bankruptcy be required to protect a creditor from the decline in value of its realty when this decline would have occurred during a foreclosure action in state court anyway? By requiring farmer/debtors to make adequate protection payments for all post-petition decline in value of

their real estate, a secured creditor would obtain a windfall in bankruptcy, at the expense of the debtor, which the creditor would not receive outside of bankruptcy. If a secured creditor were allowed adequate protection for decline in value *and* lost opportunity cost, a debtor's payments would probably be greater under bankruptcy than they were under the original mortgage. Such a treatment would hardly give a debtor a reasonable chance of reorganizing.

*In re Asbridge,* 66 B.R., at 902.

As thus construed, compensation for collateral value decay is not a component of adequate protection until that point in time when, but for the advent of the bankruptcy filing, the creditor could have obtained possession and disposed of the property. The collateral's value as of the date of anticipated market disposition is entitled to protection but until that date is ascertained and the creditors' intentions and ability with respect to ultimate disposition are known, there is no reason to protect the value. Any other collateral value protection would be artificial and not normally expected in non-bankruptcy foreclosures. That is to say, any collateral value decline occurring during the period of redemption or thereafter caused by existing real life market conditions is not a consequence of the bankruptcy and should not be borne by the debtor. If, however, the creditor, but for the bankruptcy, could have disposed of the property at a particular point in time and for a particular price, that price is the collateral value entitled to protection. In the case at bar, the evidence suggests that even were Travelers presently possessed of the property, they would not dispose of it but would instead hold it off the market for an extended period until the market rebounds. When this might occur is left for speculation.

■ Adequate protection for lost opportunity cost also depends upon a time factor. According to *Ahlers,* the bankruptcy court, in insuring creditors with the same level of protection they would have received outside of bankruptcy, should determine (1) the date when the creditor, absent the bankruptcy filing could have taken possession of the collateral under state law and sold it, (2) the amount the creditor could have realized at the sale, and (3) the creditor's expected return upon reinvestment. From the evidence presented, however, Travelers has no present intent of disposing of the 4,620 acres were it in possession, thus, its calculated market return of 10.25% is for the present irrelevant. We said in our *Asbridge* decision that lost opportunity cost cannot include loss of interest income on sale proceeds if the property would not have been sold. *In re Asbridge,* 66 B.R., at 901.

■ *Ahlers* further teaches that if a foreclosure was not commenced prior to bankruptcy filing, the starting date for calculation of the delay caused by bankruptcy is the date the creditor moves for adequate protection. The reason for this starting point is that if a secured creditor has up to that point not initiated any action, it has not been deprived of the benefit of its bargain by advent of the bankruptcy filing. *Grundy National Bank v. Tandem Mining Corp.,* 754 F.2d 1436, 1441 (4th Cir. 1985) (cited in *In re Ahlers,* 794 F.2d, at 396 n. 6). In the instant situation there were several previous relief from stay motions filed by Travelers prior to March, 1986, but all were resolved by stipulated payments being made up to and including December 1, 1985. Thus, the appropriate starting point should be March 13, 1986, the day Travelers renewed its motion for relief from stay. Both parties harken to the normal foreclosure process in North Dakota and agree that a minimum of fifteen (15) months would be the typical delay occasioned by the foreclosure process. *See generally Asbridge,* 66 B.R., at 900. Assuming Travelers commenced foreclosure on March 13, 1986, it would not obtain a possessory interest until June 13, 1987.

■ As before discussed, it appears that the present company policy of Travelers is to hold onto re-possessed property rather than sell it. Travelers has indicated no intention of selling the property nor has it

presented any evidence as to how such a sale might be accomplished or what the anticipated return might be. We do not know what the market value of the Stutsman County land might be in June, 1987. Thus, the court believes Travelers is not entitled to adequate protection for lost opportunity cost as measured by interest on re-investment nor is it entitled to adequate protection for collateral value decline occurring while Travelers, in consequence of company policy, elects to hold the land off the market.

■ After expiration of a redemption period and during the time a mortgagee has possession of the land, it is, by virtue of the sheriff's deed, seized of all interests inherent in ownership. This would include the right to rents and profits. These are valuable interests which, but for the bankruptcy filing, would inure to Travelers after June 13, 1987, and these rights are deserving of protection to the extent of their value. The problem is whether these rights would be exercisable in June—a time when crops are normally planted and the season underway. The Debtor rented out the land for 1986 and may well do the same for 1987. If leased out for the 1987 year, such leasing will have been done subsequent to the fictional issuance of a sheriff's certificate to Travelers but before expiration of the redemption period. During the redemption period a mortgagor has, under state law, the right to possession, rents, use and benefit of the property and thus quite properly Glinz could lease the Stutsman County land out to others. N.D.Cent. Code § 28–24–11 (1974). To do so is not without risk, for the effect of a sheriff's deed fictionally issued in this case on June 13, 1987, is to vest in the grantee all the right, title, and interest of the mortgagor in the property. This includes a landlord's interest in crops. Thus, should Glinz lease out the Stutsman County acreage for 1987, his right to a landlords share of the crops would be at an end as of June 13, 1987. *See Tanous v. Tracy,* 55 N.D. 100, 212 N.W. 521, 522 (1927). If Glinz elects not to lease out the land but instead farm it himself, he is still at risk for, the *Tanous* case

teaches that issuance of the sheriff's deed divests the mortgagee of every and all interest in the land including unharvested crops. The only exception is if the mortgagee is somehow able to continue in uninterrupted possession through harvest, which seems unlikely since possession of a sheriff's deed gives one the right to immediately oust the mortgagor from possession and thereby cutoff his right to cut and harvest the crop. *Zeigler v. Blecha,* 59 N.D. 258, 229 N.W. 365, 368 (1936). Recognition of these realities would in a non bankruptcy context cause any mortgagor to pause before either share-leasing or planting land when he would effectively become dispossessed midway through the season. By the same token, it is likely that a mortgagee upon obtaining a sheriff's deed would be unable to rent the land if it had previously been leased to a third party. Without cooperation the result is a stalemate where neither party does anything and the land lies fallow to the detriment of both. Overcoming this impasse requires some accomodation which in an *Ahlers* context turns into adequate protection. In exchange for allowing the Debtors the right to remain in possession past the fictional date of June 13, 1987, retain a leasehold interest, and retain the profits, Travelers should be accorded adequate protection in the form of the rental payments normally expected on land in Stutsman County for the 1987 crop year. The best testimony is that of Mr. Glinz himself on what the per acre rental basis is. Using a range of $15.00 to $20.00 per acre, the court chooses the rate of $18.00 per acre as a fairly close approximation of what the rental would be for the 1987 year. This figures to $83,-160.00 due Travelers as adequate protection for foregoing its post-sheriff's deed interest in the landlord's crop share and its right to planted crops. This sum shall become due and payable no later than January 10, 1988, and, should a plan be confirmed before then, this payment shall merge into the first payment to Travelers coming due under the plan on January 10, 1988. The plan as presently composed con-

templates a payment of $79,649.50 for the 4,620 acres. If this plan is confirmed, the first payment would become $83,160.00 in recognition of the 1987 adequate protection payment. If no plan is confirmed and the case remains open or dismissed, the Debtors will in any event be required to make the $83,160.00 payment on January 10, 1988. This payment shall not be affected by any subsequent modification of the Debtors' plan and shall remain a constant amount which shall remain due on January 10, 1988, regardless of whatever eventual modifications might be necessary in the plan payments to Travelers. As security for this payment, Travelers shall be given a lien on the Debtors' share of the 1987 crop grown on the Stutsman County land to the extent of $83,160.00.

Although the court has determined that no award for collateral value decline or income re-investment is appropriate at this time, such finding is without prejudice to Travelers filing a subsequent motion should circumstances change as to its policy and ability to sell the land and re-invest the proceeds.

Accordingly, it is this court's opinion upon remand and reconsideration in light of *In re Ahlers* that the automatic stay shall remain in effect conditioned upon payment by the Debtors of $83,160.00 on or before January 10, 1988, as more completely explained in the body of this memorandum. Said payment shall be secured by a lien in the Debtors' share of the 1987 crop grown on the Stutsman County land.

IT IS SO ORDERED.